UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIESTE, LLC, ET AL., | No. C-09-04024 JSW (DMR) |
| Plaintiffs, | **ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR SANCTIONS** |
| v. | |
| HILL REDWOOD DEVELOPMENT, ET AL., | |
| Defendants. | |

## I. INTRODUCTION

Plaintiffs filed a motion for issuance of spoliation sanctions pursuant to the Court's inherent powers and Federal Rule of Civil Procedure 37. Defendants responded, followed by Plaintiffs' reply. *See* Docket Nos. 234, 263, 273. The Court conducted a hearing on May 12, 2011, during which the parties were provided an opportunity to present argument. Having considered the parties' briefs and accompanying submissions as well as oral argument, the Court hereby GRANTS Plaintiffs' motion in part and DENIES it in part.

Plaintiffs did not submit evidence supporting the amount of monetary sanctions as part of their moving papers. At the May 12, 2011 hearing, the Court ordered briefing from both sides as to the amount of reasonable attorneys' fees and costs that should be awarded to Plaintiffs as a sanction against Defendants. *See* Docket Nos. 324 & 327. Having considered the parties' submissions, and having deemed that the matter appropriately may be decided on the papers without oral argument,

1  this Order also contains the Court's ruling as to the amount of sanctions that should be levied against
2  Defendants in the form of attorneys' fees and costs payable to Plaintiffs.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

In August 2009, Plaintiffs filed suit against two individual Defendants, Stephen Goodman and S. Dick Sargon, and four entities, Hill International Development, Ltd. ("HID"), Hill International, Inc. ("Hill International"), Hill Redwood Development, Ltd. ("HRD"), and Redwood Capital Advisors, LLC ("RCA"), alleging, *inter alia*, claims of breach of contract and fraud arising out of the parties' October 2008 agreement to form a joint venture to pursue real estate development opportunities in Metropolis, Illinois and Xalapa, Mexico.

In January 2011, Plaintiffs submitted a letter brief to the Court regarding concerns about Defendants' document preservation and collection efforts. Plaintiffs' concerns were based in part upon deposition testimony by two witnesses affiliated with Defendants that they were not informed of their duty to preserve relevant documents until shortly before their depositions in mid-2010, as well as the fact that Plaintiffs believed that key documents were missing from Defendants' document production. *See* Docket No. 173.

Defendants responded to Plaintiffs' letter (Docket No. 174) and the Court subsequently conducted a telephonic hearing with the parties. Concluding that Plaintiffs had raised legitimate concerns about the adequacy of Defendants' efforts to preserve documents, the Court ordered each individual defendant and a representative or representatives from each defendant entity and from ZAC Management ("ZAC"), which is Defendant RCA's administrative arm,[1] to file and serve a detailed declaration addressing seven specific areas of information. *See* Docket No. 187. The requested information included a statement of when the individual or entity became aware of Plaintiffs' lawsuit, a description of the steps taken by the individual or the entity to preserve potentially relevant evidence and to gather documents responsive to discovery requests and when the

---

[1] Although ZAC is not a defendant in this case, the Court included it in the order to provide declarations because Defendants are on record as asserting that ZAC is an agent of Defendants'. *See* Docket No. 148 at 11. Without ruling that ZAC is a legal "agent" of Defendants, the Court nonetheless determined that it was appropriate for Defendants to provide information about ZAC's document preservation and collection efforts in this case.

2

steps were taken, and the identification of each custodian whose files were searched for relevant evidence and a description of the types of relevant records in each person's possession. *Id*.

On February 14, 2011, Defendants filed seven declarations regarding Defendants' and ZAC's document preservation and collection efforts. *See* Dockets 196-199, 201-203. In the present motion for sanctions, Plaintiffs argue that the information provided in the Court-ordered declarations reveals evidence spoliation by Defendants and again assert that key documents are missing and cannot be found. Plaintiffs also allege that Defendants violated the court order to provide declarations by failing to provide *detailed* explanations of their document preservation and collection efforts. Plaintiffs seek terminating sanctions, or in the alternative, various lesser sanctions, including an adverse inference instruction against Defendants for spoliation. Plaintiffs have also requested monetary sanctions independent of any other sanctions the Court may impose.

### III.  LEGAL STANDARDS

Courts are vested with inherent powers arising out of "'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp*., 982 F.2d 363, 368 (9th Cir. 1992) (quoting *Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991)). The Ninth Circuit has recognized trial courts' "inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6. F.3d 1318, 1329 (9th Cir. 1993). Therefore, sanctions for spoliation of evidence may be imposed under the court's inherent powers to manage its own affairs. *Leon v. IDX Sys. Corp*., 464 F.3d 951, 958 (9th Cir. 2006). Courts also have authority to sanction a party "who fails to obey an order to provide or permit discovery" pursuant to Federal Rule of Civil Procedure 37(b)(2)(A). *Id*. (internal quotation marks omitted).

Where spoliation has occurred, the determination of an appropriate sanction "is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp*., 247 F.3d 423, 436 (2nd Cir. 2001) (internal citations omitted). In determining whether and what type of sanctions to issue, courts generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by

3

the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 563 (N.D. Cal. 2008) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3rd Cir. 1994)).

Courts have developed three types of sanctions for destruction of evidence. First, "[t]he spoliation of evidence germane to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (internal quotation marks omitted). "[A] party seeking an adverse inference instruction based on destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006) (quoting *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490-CW, 2005 WL 3481423, *3 (N.D. Cal. Dec. 20, 2005)).

Second, a court can exclude witness testimony based on the spoliated evidence. *See Unigard*, 982 F.2d at 368-369. Third, a court may dismiss the claim of the party responsible for the spoliation when the court determines that "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)). "Before imposing the 'harsh sanction' of dismissal," either pursuant to a court's inherent power or to Rule 37, a court must consider the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* (internal quotation marks and citations omitted). The court need not find bad faith by the offending party before issuing terminating sanctions for destruction of evidence; willfulness or fault may suffice. *Id.*; *Unigard*, 982 F.2d at 368 n.2.

## IV. DISCUSSION

In their motion for sanctions, Plaintiffs cite two bases for imposition of sanctions. First, Plaintiffs argue Defendants failed to comply with the Court's order to provide detailed declarations describing their document collection and preservation efforts. Second, Plaintiffs argue that Defendants are responsible for spoliation of key evidence in this case. The Court will address each basis for sanctions in turn.

### A.   Defendants' Document Preservation and Collection Efforts & the Court's Order to Provide Declarations Detailing the Same

Plaintiffs argue that sanctions are warranted for Defendants' failure to comply with the Court's February 4, 2011 order to provide detailed declarations describing their document collection and preservation efforts, pointing to significant gaps in the information provided in the declarations to argue that the declarations were evasive and unforthcoming. Defendants argue that they took adequate measures to preserve relevant documents and conducted appropriate searches for responsive documents, as required under the Federal Rules of Civil Procedure and this Court's prior orders. They also argue that they fully complied with the court order to provide declarations.

Litigants are under a duty to preserve "what [they know], or should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("*Zubulake IV*"). The duty extends to "any documents or tangible things . . . made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.'" *Id*. at 217-218 (quoting Fed. R. Civ. P. 26(a)(1)(A)). The duty to preserve evidence arises as soon as the parties reasonably anticipate litigation. *Id*. at 216.

The Court issued the order to provide declarations after Plaintiffs presented an evidentiary record that raised serious questions about the integrity of Defendants' preservation and collection efforts. In connection with this motion, Plaintiffs supplemented some of the evidence they initially presented to the Court; this evidence, along with information revealed by the declarations themselves, is troubling. For example, Defendant S. Dick Sargon, who is also President of

Defendants HID and HRD, testified unequivocally that he was never told to preserve documents.[2] Sargon Dep. 111:20-21, Feb. 3, 2011. Steven Freiberg, Defendant RCA's CFO and ZAC's Vice President and CFO, testified that he was not told by anyone to preserve documents until he received a deposition subpoena in June 2010. Freiberg Dep. 105:22-106:6, Jan. 11, 2011. Steven Fishman, who is an identified source of potential investor funding for the projects at issue, the Chairman of the Board of RCA, the Co-Chairman of the Board of HRD, and President and majority owner of ZAC, is clearly a central figure in this dispute. Fishman uses a ZAC email address, and it appears that ZAC took no steps to preserve documents until May 2010. Docket No. 196 ¶ 3. Terresa Cordova-Goodman is married to Defendant Stephen Goodman and worked for RCA. Her job duties included gathering and reviewing documents, including financial statements, related to the investment projects at issue. She testified that she was never told that she had a duty to preserve documents until a couple of weeks before her deposition in June 2010. Cordova-Goodman Dep. 205:10-206:10, June 3, 2010.

Further, a number of people who were identified by Defendants as Rule 26(a)(1)(A) witnesses -- that is, persons with knowledge relevant to Defendants' claims or defenses -- appear to not have been identified as custodians for purposes of preservation and collection. Defendants have known about some of these witnesses since at least March 2010 (the date of Defendants' initial disclosures), but there is no indication that they ever searched the records of Kirk Chamberlin or John Hertzog, both former Hill International employees; Lucy Ngan, a former RCA employee; or William Dengler, an officer of three of the entity defendants.[3]

---

[2] Mr. Sargon later hedged this response, but in response to the question "[w]ere you ever told you had a duty to make sure documents were preserved[?]" Sargon responded "*I wasn't.*" Sargon Dep. 111:20 (emphasis added).

[3] Defendants argue that the fact that a witness may possess relevant information does not necessarily mean that they possess relevant documents. However, what is glaringly missing from Defendants' document preservation and collection declarations is a statement that these witnesses' files were searched at any time during this litigation, so it is unclear how Defendants know these individuals did not possess relevant documents. Further, as previously noted, the duty to preserve extends to documents or tangible things made by individuals identified pursuant to Rule 26(a)(1)(A). *See Zubulake IV*, 220 F.R.D. at 217-218.

1    In light of this troubling evidence, the Court ordered each defendant entity and ZAC to
2 submit declarations regarding document preservation and collection declarations.  The Court set
3 forth seven specific areas of inquiry for each declarant to address in detail in the declarations, and
4 even emphasized the words "detailed declaration" in the order.  Plaintiffs now argue that Defendants
5 violated the Court's order by submitting declarations that were short, conclusory, and failed to
6 include all of the information set forth in the order.

7    The Court agrees.  The declarations provided by Defendants omitted or glossed over some of
8 the requested information, and were often evasive and unforthcoming.  For example, Defendant
9 Goodman, who submitted a declaration on behalf of Defendant RCA, stated that RCA's computer
10 system overwrites electronic data on an annual basis.  Goodman made a conclusory statement that
11 "no documents relating to this lawsuit were over-ridden [sic]," but he provided no factual basis to
12 support the conclusion.  Docket 199 ¶ 3.  Particularly troubling is the fact that Goodman said that he
13 took steps to preserve potentially relevant evidence "immediately," but does not say that he or
14 anyone else at RCA *ever* suspended the system's overwrite function in response to this litigation.
15 *Id*.  Goodman stated that he searched his emails and asked RCA staff members to check their emails,
16 but he did not say when he did either of those things, nor did he state that he told staff to take steps
17 to preserve documents.  *Id*. at ¶ 4.  He gave no details about the search for documents, such as
18 providing guidance to staff members about what information they were to search for, or whether he
19 used or provided search terms to the staff to use to aid in the search.  He also did not indicate when
20 any search took place.  Further, although the order specified that each declarant was to specify the
21 types of relevant records in each person's possession and the approximate number or size of relevant
22 records, Goodman's declaration dodges these questions. Id. at ¶¶ 5, 6.  Finally, there is nothing in
23 RCA's declaration to suggest that Steven Fishman's files were searched, even though Fishman is a
24 central figure in this litigation, and is Chairman of the Board of RCA.

25    Defendant Sargon submitted virtually identical declarations on behalf of himself and
26 Defendants HRD and HID.  Sargon provided no statement about *when* he made efforts to preserve or
27 search for documents.  Docket Nos. 201-203 at ¶ 3.  The same is true about his instructions to search
28 for documents to his secretary, Edith Lee, Defendant Goodman and Goodman's assistant Maria

7

Rogers. *Id*. Further, even though Sargon stated that he instructed Lee, Goodman, and Rogers to search for documents, he did not explain what it was that he told them to search for. *Id*. In his declaration, Sargon listed the search terms he used, which were very simplistic -- Vieste, Xalapa, and Metropolis, and emails with two people affiliated with Plaintiffs -- but apparently he did not search for emails with others within his organizations. *Id*. With respect to describing record retention policies, Sargon was vague, stating that his and HRD's documents are archived or maintained "for a number of years." Docket Nos. 201 & 202 at ¶ 6. Again, there is nothing in HRD's declaration to suggest that Fishman's files were searched, even though he is the Co-Chairman of the Board of HRD.

With respect to Steven Freiberg's declaration on behalf of ZAC, Freiberg stated that it was not until May 2010, *seven months* after Freiberg learned of this lawsuit, that ZAC first made efforts to preserve documents. Docket No. 196 at ¶ 3. The Court is aware from other motions that there are two other ZAC employees, Dino Cataldi and Elisa Tractman (controller and attorney for ZAC subsidiary, respectively), who played a role on the projects, but there is no indication that they were instructed to search for and/or preserve documents. In May 2010, Fishman and Wendy Cain, another ZAC employee, "confirmed that they had no paper files," but it is unclear whether paper files ever existed and were lost or destroyed before then. *Id*. at ¶ 5. Freiberg also described ZAC's computer systems's automatic annual overwrite of data, but does not indicate that the automatic overwrite was ever suspended in response to this litigation. *Id*. at ¶ 12.

Finally, as to Defendant Hill International's declaration, submitted by Aileen Schwartz, Vice President and General Counsel of Hill International, the information provided is relatively complete, but Schwartz did not give any information about the amount of non-electronic information gathered in response to this litigation. Docket No. 197 at ¶ 5. In addition, the declaration does not appear to provide any information about Hill International's retention policies for emails. *Id*. at ¶ 7.

In sum, Defendants failed to provide adequately detailed declarations regarding their document preservation and collection efforts, and thus violated this Court's February 4, 2011 order. Defendants' failure to comply with a court order "to provide or permit discovery" is sanctionable pursuant to Rule 37(b)(2)(A), and the Court finds that the payment of reasonable expenses,

including attorneys' fees, by Defendants to Plaintiffs for the failure to comply with the order is appropriate, as discussed further *infra*. *See* Fed. R. Civ. P. 37(b)(2)(C).

### B.     Alleged Spoliation of Evidence

Plaintiffs assert that the information contained in Defendants' declarations reveals that Defendants failed to meet their preservation and collection obligations. Plaintiffs identify several categories of key documents that they claim are missing from Defendants' production, and hypothesize that the documents were destroyed as a result of Defendants' failure to meet their obligations, warranting sanctions for spoliation. Defendants categorically deny that any spoliation of evidence has occurred.

Before determining any sanction for destruction of evidence, the Court must first determine whether spoliation actually occurred. The Court will examine each category of documents in turn.

#### 1.     Presentation Books, Transmittal Letters, and Financial Modeling

Plaintiffs first identify two categories of documents that they claim are missing from Defendants' document production: presentation books with corresponding transmittal letters, and financial modeling documents.

Plaintiffs claim that Defendants prepared presentation books for potential investors containing project information and representations about the viability of each of the projects at issue, and that the books were accompanied by transmittal letters when they were sent to potential investors. Plaintiffs also argue that financial modeling documents that Goodman prepared for the projects, including a "time versus revenue" model, a creditworthiness model and a returns model, have not been produced. Defendants argue that Plaintiffs' perceived problem is simply an issue of semantics. Defendants claim that all of the materials to which Plaintiffs refer as the "presentation book" and "financial modeling" are just the "seed equity book," which both Defendants and Plaintiffs produced in discovery, as well as other documents prepared by Plaintiffs that Goodman gave to Marc Goldin, a potential investor.

Plaintiffs largely rely on the testimony of Terresa Cordova-Goodman, who testified about a presentation book for the Xalapa project. However, she testified that she didn't remember if it was ever sent to investors. Cordova-Goodman Dep. 201:22-202:7. There is no testimony in the record

9

about whether a presentation book was ever prepared regarding the Metropolis project. When Goodman was questioned about whether he prepared a presentation book for Xalapa, he responded, "Not in this form," apparently referring to RCA's practice regarding certain projects. Goodman Dep. 39:9 Feb. 11, 2011. Cordova-Goodman's testimony about the existence of transmittal letters was speculative; she testified that if the Xalapa presentation book was sent to anyone, a transmittal letter would have accompanied the book. Cordova-Goodman Dep. 203:5-9.

Goodman testified that he prepared presentation "materials" for the Xalapa project, including a flow chart of how the entities would interact, a list of potential real estate projects that could be a source of returns, and "some level of financial analysis." Goodman Dep. 40:3-24. When asked whether these documents had been produced to Plaintiffs, Goodman testified that he had not seen what he prepared "produced in tact [sic]." Goodman Dep. 49:14-17. Defendants argue that these materials have in fact been produced to Plaintiffs, and explain Goodman's testimony by stating that "he just has not seen all of them in their original form as they were contained in the actual document production." Docket No. 263 at 14.

Plaintiffs point to testimony by Goodman that he worked with Plaintiffs to put together projections of development fees, and then extracted some of that information for a "time versus revenue" model that he provided to three potential investors. Plaintiffs claim that this model has not been produced. However, upon review of Goodman's testimony, it appears that the term "time versus revenue model" was a phrase Plaintiffs' counsel used, not Goodman: upon questioning about whether he would refer to the financial analysis he performed as "financial modeling," Goodman responded "[i]n a general sense, yes." Goodman Dep. 246:24-247:1. In fact, Goodman testified that he worked with Plaintiffs to put together financial projections of "the date and the amount of development fees that [they] would expect" from the projects," and that copies of the projections had been produced in the case. Goodman Dep. 246:21-247:10. There is no evidence in the record that a creditworthiness model or a returns model existed.[4]

---

[4] At the hearing, Plaintiffs' counsel pointed out that in response to an interrogatory, Defendants identified Guadalupe Martinez as having prepared financial models, and argued that this is further evidence that models relating to these projects existed and have not been produced. However, the interrogatory response at issue provides a general description of Martinez' job duties,

10

In sum, the evidence in the record is simply not clear that the documents described by Plaintiffs as presentation books, transmittal letters, and financial modeling documents ever existed in a form separate from those documents already produced by Defendants. Accordingly, the Court cannot say that spoliation has occurred with respect to these documents. The Court does note that if any of the "missing" documents as described above suddenly come to light, Defendants would be precluded from using or referring to them at trial. *See* Fed. R. Civ. P. 37(c)(1).

### 2. Xalapa Appraisal

Plaintiffs next claim that an appraisal that Defendant RCA received for the Xalapa project is missing. As with the documents discussed above, it is unclear whether this appraisal ever existed. Plaintiffs again rely on Cordova-Goodman's speculative testimony to argue the existence of this document. After she was shown an email that apparently referred to such an appraisal, she testified that based on the email, she "would say yes" as to whether an appraisal existed. Cordova-Goodman Dep. 193:2. In other words, Cordova-Goodman did not appear to have a clear and independent recollection of an appraisal. Plaintiffs did not present a copy of the email for the Court to evaluate. Cordova-Goodman later testified that she had "the briefest memory of . . . an English translation of a Mexican appraisal," and that she didn't believe that it was a full appraisal. Cordova-Goodman Dep. 193:5-7. Defendants claim that no appraisal existed, arguing that Cordova-Goodman "had no idea about the existence of any appraisal and was only speculating." Docket No. 263 at 14.

As with the presentation books, the Court finds that Cordova-Goodman's testimony about an appraisal for the Xalapa project is less-than-conclusive evidence that it actually existed. In addition, although she used the terms "presentation book" and "appraisal" when testifying, her role appears to have been administrative and it is clear that she did not create financial documents herself. Based on the evidence presented, the Court cannot conclude with any certainty that an appraisal of the Xalapa project existed and was lost or destroyed. Again, Defendants would be precluded from using or referring to any appraisal that has not previously been produced in discovery.

### 3. Pfife Hudson Engagement Letter

---

not the specific job duties she performed on the projects at issue. *See* Docket No. 234-10 at 3.

11

1    Plaintiffs next argue that Defendants have failed to produce an engagement letter between
2 Defendant RCA and Pfife Hudson, an investment bank that Defendant Steven Goodman contacted to
3 raise money for the development projects.[5]  To support this, Plaintiffs cite testimony by Marc
4 Goldin, a potential investor, who testified that he believed that Pfife Hudson "prepared some sort of
5 engagement agreement" for RCA.  Goldin Dep. 49:11-13 July 19, 2010.  Goldin testified that he
6 does not have a copy of the document.  Goldin Dep. 49:17.
7    Defendants argue that the "engagement agreement" was prepared by Pfife Hudson, not
8 Defendants, and that there is no evidence that Defendants (as opposed to Goldin) received the letter
9 and somehow lost it.  Docket 263 at 15.
10    Plaintiffs subpoenaed documents from Pfife Hudson and the engagement agreement was not
11 produced.  While it appears from Goldin's testimony that the engagement agreement may have
12 existed, it did not turn up in Pfife Hudson's or Defendants' files.  As there is no evidence that the
13 document was ever provided to Defendant RCA, RCA cannot be held accountable for its
14 disappearance.  However, Defendants shall be limited in offering evidence at trial about the
15 engagement letter.  Specifically, Defendants may not offer testimony by their current or former
16 employees about the engagement letter as they took the position in this motion that they never
17 received it.  *See* Docket No. 263 at 15.  To the extent Defendants seek to call Goldin as a witness to
18 testify about the engagement letter, the trial court is in the best position to determine whether it is
19 appropriate to limit Goldin's testimony about the document or fashion a corresponding jury
20 instruction.

### 4. Defendant Goodman's Emails

22    Finally, Plaintiffs argue that the paucity of Defendants' production of emails from Defendant
23 Goodman's custodial files should lead the court to conclude that many of Goodman's emails have
24 been destroyed.  Plaintiffs argue that Goodman's email correspondence with his investor contacts

---

[5] Plaintiffs also argue that there are other missing project-related documents that Goodman gave to Pfife Hudson.  However, the only evidence in support of this is Goldin's testimony that he remembers that Goodman gave an unidentified document to a Pfife Hudson employee.  Goldin Dep. 44:21-23.  The Court cannot determine from Goldin's limited testimony whether the document had anything to do with this case.

and with his co-defendants are arguably the most relevant documents in this case. Yet Plaintiffs assert that Defendants produced only two emails from Goodman's custodial files, and neither email discusses his financing modeling, projections, cash flows, or his efforts to secure financing for the projects. Further, Plaintiffs claim that Defendants produced no internal emails between Goodman and Defendant Sargon, Goodman and Fishman, or Goodman and RCA staff regarding financial modeling for the projects. Plaintiffs also point out that Defendants' damages expert claims that Goodman spent 286 hours working on the projects, and that Goodman claims to have made several trips to New York to meet with Pfife Hudson about the projects. Plaintiffs argue that the fact that Goodman can only locate two emails evidencing his efforts on these projects over the course of several months clearly evidences spoliation. *See* Docket No. 273-6 at 5-6.

Defendants emphatically deny that there has been any spoliation of Goodman's emails. Defendants dispute Plaintiffs' assertion that only two emails in their entire document production came from Goodman's custodial files, and respond that they produced at least 132 emails to which Goodman was a party. Docket No. 263 at 18. In their opposition to this motion, Defendants identified the bates-stamp numbers of each of the 132 emails. Docket No. 262 ¶ 11. In their reply, Plaintiffs submitted a chart that includes information about each of the emails identified by Defendants to which Goodman was a party. The chart lists custodial information for each email that Plaintiffs claim, without support, "was generated from information provided by Defendants' counsel." Docket No. 273-1 ¶ 8. According to Plaintiffs' chart, only two of the emails were produced from Goodman's custodial files.

The Court notes that evidence that only two emails were produced from Goodman's custodial files would strengthen the likelihood that documents are missing from Goodman's files, and could result in a finding of spoliation. For example, in *Nursing Home Pension Fund v. Oracle Corp.*, the court found that defendant destroyed or failed to preserve evidence where it had produced only 15 emails from a senior officer's email files, but had produced over 1,650 of his emails from the files of other employees. 254 F.R.D. at 565; *see also In re Napster*, 462 F. Supp. 2d at 1077 n.5 (considering other produced emails as evidence of the type of documents missing from production). Therefore, the court held that plaintiffs were entitled to an adverse inference instruction regarding

13

the emails. *Nursing Home Pension Fund*, 254 F.R.D. at 567. However, in that case, it was undisputed that only 15 emails were produced from the senior officer's custodial files. By contrast, in this case the number of emails produced from Goodman's custodial files is roundly in dispute.

Upon questioning at the hearing on this motion, Plaintiffs' counsel claimed that defense counsel Ari Baruth told her that the custodial information for emails produced by Defendants may be determined from the face of the document, that Plaintiffs used Baruth's representation to determine the custodial information for each of the 132 emails, and that this analysis revealed that only two emails had come from Goodman's custodial files. However, there is not enough evidence in the record to conclude that Plaintiffs' analysis is an accurate reflection of the information given to her by Mr. Baruth. Specifically, there is no evidence in the record to support the assertion that Defendants have admitted that custodial information may be determined by looking at the face of the document; Plaintiffs' counsel conceded as much at the hearing. Therefore, as described above, while the Court has serious concerns about Defendant Goodman's document preservation and collection efforts, the Court cannot conclude on the record before it that only two emails were produced from Defendant Goodman's custodial files. Accordingly, the Court does not find that spoliation occurred with respect to Goodman's emails.

In conclusion, Plaintiffs have not established that any spoliation of evidence has occurred in this case. Accordingly, the Court declines to sanction Defendants for spoliation.

### C. Reasonable Attorneys' Fees and Costs

As to the proper amount of sanctions, during the hearing on this motion, the Court found that Defendants' violation of the order to provide document preservation and collection declarations justifies the imposition of sanctions in the form of reasonable attorneys' fees and costs incurred in bringing this motion. Defendants' declarations failed to answer some basic questions, and answered others with minimal information and conclusory statements. They were far from the "detailed declarations" ordered by the Court, and tended to raise more questions than they answered. As a result, Plaintiffs spent unnecessary resources to challenge the deficient declarations.

Plaintiffs argue that they should be compensated for 54.9 hours of work spent by their counsel in connection with the motion for sanctions at an hourly rate of $375, for a total of

14

$20,587.50. *See* Docket No. 324. Defendants argue that the number of hours claimed are excessive, claiming that the issues presented in the motion were simple and that Plaintiffs did not prevail on their request for any spoliation sanctions. *See* Docket No. 327.

Having carefully reviewed the time records submitted by Plaintiffs, the Court finds that Plaintiffs should be awarded a total of $12,000 in reasonable attorneys' fees and costs. This amount takes into account a reduction in the amount of fees sought by Plaintiffs due to the fact that they did not prevail on a good portion of their motion. Given that Defendants signed the substandard declarations, the sanctions shall be paid by Defendants (rather than defense counsel) to Plaintiffs within forty-five (45) days of the date of this Order.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part Plaintiffs' motion for sanctions and awards Plaintiffs fees in the amount of $12,000.

IT IS SO ORDERED.

Dated: June 6, 2011



DONNA M. RYU
United States Magistrate Judge